**EDMONDS INSTITUTE,**
**et al., Plaintiffs,**

v.

**Bruce BABBITT, Secretary of the**
**Interior, et al., Defendants.**

**No. Civ.A. 98–561(RCL).**

United States District Court,
District of Columbia.

April 12, 2000.

Joseph Mendelson, III, International Center for Technology Assessment, Washington, DC, for plaintiffs.

Wilma A. Lewis, Mark E. Nagle, Scott Sutherland Harris, United States Attorney's Office, Washington, DC, for defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the court on the parties cross-motions for partial summary judgment. Plaintiffs, three environmental advocacy organizations and a frequent visitor to Yellowstone National Park ("Yellowstone" or "Park"), challenge as arbitrary and capricious the Department of the Interior's ("Interior") entry into a research agreement with a private biotechnology company for the "bioprospecting" of microbial organisms from geysers and other thermal features in Yellowstone. Upon consideration of the motions, the oppositions thereto, the relevant record, and the applicable law, the court GRANTS defendants' motion for summary judgment and DENIES plaintiffs' motion for summary judgment.

## I. BACKGROUND

This court has previously detailed the factual background underlying the present dispute. *Edmonds Institute v. Babbitt,* 42 F.Supp.2d 1, 4–9 (D.D.C.1999). Accordingly, the court now provides only an abbreviated review the salient facts and procedural history of this case.

### A. The Yellowstone–Diversa CRADA

Yellowstone is the nation's oldest national park. To commemorate its 125th anniversary, defendants hosted a ceremony on August 17, 1997, which was attended by top environmental policymakers, including Vice President Al Gore, Secretary of the Interior Bruce Babbitt, National Park Service Director Robert Stanton, and Yellowstone Superintendent Mike Finley. At the ceremony, it was announced that the federal government had entered into a novel contract with San Diego-based Diversa Corporation, by which Diversa would obtain a nonexclusive right to "bioprospect"[1] microbial organisms in Yellowstone, in exchange for an agreement to share with Yellowstone a portion of any financial returns generated by commercial applications or products developed from these research materials.

This novel agreement, officially termed a Cooperative Research and Development Agreement ("CRADA"), was the first of its kind to involve a national park. The Statement of Work in the CRADA explains how Yellowstone and Diversa will cooperate in researching and cataloguing the Park's biological diversity, primarily in the Park's thermal features such as geysers, hot springs, fumaroles, and mud pots, as well as in Yellowstone's "alpine tundra ecosystems, subalpine forests; riparian habitats, sedge marshes, bogs, swamps, streams and lakes." CRADA, Statement

---

1. As this court has previously explained, bioprospecting refers to a relatively new method of natural resource utilization that targets microscopic resources, such as the genetic and biochemical information found in wild plants. *Edmonds Institute v. Babbitt,* 42 F.Supp.2d 1,

5–6 (D.D.C.1999). Bioprospecting is an extension of the field of biotechnology, which uses biological resources like genes and enzymes to develop beneficial pharmaceutical and industrial products and applications. *Id.*

of Work at 2. Following an initial survey, sites will be "prioritized and systematically sampled by [Diversa] scientists," using techniques to be "jointly selected by YNP and [Diversa] to ensure that there is no significant impact to park resources or other appropriate park uses." *Id.* Once raw samples have been extracted from the selected sites, nucleic acids will be isolated, purified and used to create a library of genetic information. *Id.* at 2–3. The resulting gene libraries will be the starting point for the discovery and cloning of bio-catalytic and bioactive compounds, which will be evaluated for potential commercial applications. *Id.* These libraries of genetic information will also be available to Park scientists for their own research. The CRADA and Statement of Work explicitly state that all activity carried on under the agreement will be in accordance with applicable law, including Yellowstone's management policy. According, to conduct the research under the CRADA, Diversa applied for and was issued a Research Authorization/Collection Permit, which authorized the Collection of certain biological materials from Yellowstone. Since 1994, prior to its entry into the CRADA, Diversa, under its previous name Recombinant Biocatalysis, Inc., had already been conducting the same sort of sampling from Yellowstone, pursuant to permits issued in accordance with Park regulations. The main difference, however, is that prior to the CRADA, the company was under no obligation to share any of the economic or other benefits that might result from its research on Park resources.

Thus, perhaps the most notable feature of the CRADA is the consideration that Yellowstone stands to receive in exchange for access to its biodiversity. Defendants have disclosed that Diversa will make annual payments of around $20,000 to the defendants, as well as provide research equipment and other support for Yellowstone's use and benefit. More importantly, however, Diversa will pay royalties to Yellowstone on any future commercial use or product derived from the company's bioprospecting activities in the Park. Although the specifics are not public, Yellowstone has indicated that it will receive royalties of between .5% and 10% depending upon the nature of the raw material and the final product. By virtue of the CRADA, Yellowstone will share in any revenues generated by future beneficial applications or products developed from Diversa's research at Yellowstone.

### B. Bioprospecting in Yellowstone

Notwithstanding the novelty of the Yellowstone–Diversa CRADA itself, this agreement is not the first time that the National Park Service has permitted scientific research and collection of microbial specimens from Yellowstone's thermal features. To the contrary, the earliest research permit authorizing collection of microbial samples from Yellowstone was in 1898. Indeed, in recent years, the number of annual requests by researchers for access to Yellowstone has averaged 1,500, with some 250–300 research permits issued each year (between 40 and 50 of which are for microbial research projects). Declaration of Michael Soukoup ("Soukoup Decl."), at ¶ 8 Exhibit 1 to Defendants' Motion to Dismiss and for Summary Judgment. National Park Service regulations govern this permit system and ensure that research activities are consistent with the Yellowstone and Interior's overall goals.

Prior to the CRADA, Diversa or other researchers were free to remove any specimen within the purview of their permit and develop it as they wished. If such development led to commercial uses, the Park Service never saw any proceeds from the derivative products. Thus, recognizing that resources yielding potentially valuable properties were being removed from Yellowstone with no remuneration to Yellowstone or the American people, *see* Soukup Decl. ¶ 9, officials at Interior began to consider a resource management scheme, patterned on the successes of Costa Rica and other nations, which would use biop-

rospecting to provide funds and incentives for the conservation of biological diversity. To that end, the defendants opened negotiations in 1995 with the Diversa Corporation and other biotechnology companies to explore possible bioprospecting contracts. These potential agreements would be drafted as cooperative research and development agreements (CRADA) under the Federal Technology Transfer Act of 1986, which authorizes federal laboratories to enter into CRADAs with nonfederal entities to facilitate the sharing of research developed in conjunction with government scientists. By the fall of 1996, Diversa and the defendants had begun drafting a CRADA that would permit the collection of raw environmental materials from Yellowstone. The final version of the CRADA was signed by National Park Service Director Robert Stanton and Yellowstone Superintendent Mike Finley on May 4, 1998.

## C. Procedural History

Plaintiff Edmonds Institute is a nonprofit public interest organization based in Edmonds, Washington. The group advocates the regulation of biotechnology and the maintenance and protection of biodiversity. Plaintiff Alliance for the Wild Rockies is a nonprofit organization committed to the preservation and protection of the native biodiversity of the Northern Rockies Region. Plaintiff International Center for Technology Assessment (CTA) is a Washington, D.C.-based nonprofit corporation focused on the environmental, economic, and ethical issues surrounding the biotechnology industry (including bioprospecting), particularly as it relates to the national parks. Finally, plaintiff Phil Knight is a resident of Bozeman, Montana who allegedly visits Yellowstone some twelve times a year to hike, photograph, and otherwise enjoy its aesthetic and recreational qualities.

Defendants, of course, are Secretary of the Interior Bruce Babbitt, sued in his official capacity, and Robert Stanton, Director of the National Park Service, also sued in his official capacity only.

In 1997, plaintiffs filed a petition requesting that the agency not enter into the Yellowstone–Diversa CRADA (or similar agreements) because the agency had failed to provide public notice of its proposed change in policy and had not undertaken the environmental impact assessment required by law. The defendants denied plaintiffs' request in January of 1998. On March 5, 1998, plaintiffs filed this action, alleging that the Yellowstone–Diversa CRADA violated the Federal Technology Transfer Act of 1986, 15 U.S.C. § 3701 et seq., the National Park Service Organic Act of 1916, 16 U.S.C. § 1 et seq., the Yellowstone National Park Organic Act, 16 U.S.C. § 21, et seq., the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., and the so-called public trust doctrine, as well as the Administrative Procedure Act, 5 U.S.C. §§ 702, 706. Following the signing of the final CRADA on May 4, 1998, the parties jointly requested a revision of the pleading schedule, and plaintiffs filed a first amended complaint on June 17, 1998.

In late August 1998, defendants moved to dismiss Counts I, II, III, and V, and moved for summary judgment on plaintiffs' NEPA claim (Count IV). Plaintiffs filed their opposition along with a cross-motion for summary judgment on the NEPA claim on September 24, 1998. In March 1999, this court denied defendants' motion to dismiss plaintiffs' statutory claims under Counts I, II and III of the complaint, while granting defendants' motion with respect to plaintiffs' public trust doctrine claim in Count V. At the same time, however, the court granted plaintiffs' cross-motion for summary judgment on the NEPA claim and ordered defendants to suspend implementation of the CRADA pending the completion of "any and all review mandated by [NEPA], including but not limited to the preparation of an Environmental Assessment." *Edmonds Inst.*, 42 F.Supp.2d at 20. The parties now

move for summary judgment as to the remaining claims under Counts I, II and III.

## II. DISCUSSION

Where a controversy presents no genuine issue as to any material fact, summary judgment is appropriate and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *FDIC v. Bender,* 127 F.3d 58, 63 (D.C.Cir.1997); *Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995). Here, the parties agree that no genuine issue of material fact exists and that the central dispute concerns whether defendants acted in accordance with the FTTA, the National Park Service Organic Act, the Yellowstone National Park Organic Act, and Park Service regulations by entering into the CRADA with Diversa.

Under the Administrative Procedure Act, courts must set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As the Supreme Court has instructed,

the 'arbitrary and capricious standard' is 'highly deferential' and presumes the validity of agency action. If the court can discern a rational basis for the agency's decision, the decision must be affirmed. Similarly, the court must uphold the agency's construction of the statute unless it is unreasonable.

*United Transp. Union v. Lewis,* 711 F.2d 233, 252 (D.C.Cir.1983) (citations omitted); *see also American Horse Protect. Ass'n v. Yeutter,* 917 F.2d 594, 595 (D.C.Cir.1990). In light of this standard, the starting point for this court's review is the language of the FTTA, for where Congress has spoken to a particular matter, Congress' plainly expressed intent governs. *Independent Petroleum Ass'n of America v. Babbitt,* 92 F.3d 1248, 1255 (D.C.Cir.1996). The validity of this CRADA under the FTTA turns upon whether Yellowstone falls within the meaning of

"laboratory" as that term is defined in the statute. By its terms, the FTTA defines "laboratory" as

a facility or group of facilities owned, leased, or otherwise used by a Federal agency, a substantial purpose of which is the performance of research, development, or engineering by employees of the Federal Government.

15 U.S.C. § 3710a(d)(2)(A).

Plaintiffs object to the application of the FTTA to the Yellowstone CRADA because they assert that the plain meaning of "laboratory" forecloses application of that term to the research facilities in Yellowstone. Specifically, plaintiffs argue that Yellowstone is not a "facility" because Yellowstone's organic statute describes the Park only as a "tract of land." 16 U.S.C. § 21.

While the court agrees that a national park does not immediately conjure the term "laboratory," the court finds that defendants have provided a reasoned basis for concluding that the broad, statutorily-assigned definition encompasses Yellowstone's extensive research facilities. *Cf. Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979) (stating that "unless otherwise defined, words will be interpreted as taking their ordinary, common meaning"); *see also* S.Rep. No. 283, 99th Cong.2d Sess. 1, 11 (1986), *reprinted in* 1986 U.S.C.A.A.N. 3442, 3453 (stating that statutory definition of "laboratory" in FTTA was "a broad definition which is intended to include the *widest possible range of research institutions operated by the Federal Government*") (emphasis added). As a preliminary matter, the court notes that because the statute has specifically defined laboratory to include facilities owned or otherwise used by a federal agency, plaintiffs "plain meaning" argument with respect to the term "laboratory" is misplaced. As noted above, where Congress has assigned a particular definition to a term, courts may not simply cast such definitions aside in favor of the term's "ordinary" meaning. *Id.* Thus, the

specific definition of laboratory provided in the statute governs the court's review.

Yellowstone's research facilities fall within the definition of laboratory under the FTTA as a "facility owned ... or otherwise used by a Federal agency," a "substantial purpose of which is the performance of research." While the term "laboratory" is defined in the statute, "facility" is not. Thus, the court must look to the ordinary meaning of that word. *Perrin*, 444 U.S. at 42, 100 S.Ct. 311. "Facility" is broadly defined as "*something* (as a hospital, machinery, plumbing) that is built, constructed, installed *or established* to perform some particular function or *to serve or facilitate some particular end*". WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 812 (1961) (emphasis added). The extensive array of research facilities at Yellowstone plainly satisfy this definition. To begin with, as defendants correctly note, the statute makes no requirement that the entire facility be used exclusively for research. To the contrary, the only statutory restriction is that a "substantial purpose" of the facility be for "the performance of research, development or engineering by employees of the Federal government." 15 U.S.C. § 3710a(d)(2)(A). Defendants have adequately demonstrated that a substantial purpose of the facilities at Yellowstone is scientific research. *See* Affidavit of John Varley, at ¶ 3 ("Varley Aff."), September 16, 1999, Attachment to Defendant's Motion for Partial Summary Judgment. Specifically, Yellowstone employs approximately 43 individuals engaged in scientific activities. Many of these scientific researchers possess doctorates or other advanced degrees, and are members of leading scientific societies. And, to coordinate scientific research at the Park, Yellowstone has established the Yellowstone Center for Resources ("YCR"), which oversees all aspects of research by Park scientists, including research concerning the Park's abundant mammalian wildlife such as bison or wolf populations, as well as the vast array of microorganisms contained in Yellowstone's hot springs and thermal features. Moreover, the plethora of scientific and research structures and equipment at Yellowstone plainly fall within the FTTA definition. For instance, Yellowstone maintains "wet" and "dry" laboratories at Yellowstone headquarters that are approved and regulated by the Occupational Safety and Health Administration, in addition to other scientific research facilities throughout the Park. Varley Aff., at ¶ 10–12. And, many of the research facilities at Yellowstone are equipped with standard laboratory equipment, including

> spectrophotometers, microscopes, stereoscopes, genetic thermal cyclers, balancers, centrifuges, refrigerators, freezers, evaporators, dryers, ovens, bunsen burners, deionizers, and other chemical, physical, and biological measuring and processing instruments, and computers....

> This laboratory equipment enables YNP personnel to perform a wide range of scientific analyses and tests that include but are not limited to animal necroscopies, DNA extraction, water analysis, soil characterization, and acid rain sampling and analysis.

Varley Aff., at ¶ 11. Yellowstone's research facilities also include geographic information systems ("GIS") and a remote sensing facility, which collects, records and analyzes environmental data from satellites and aircraft. Thus, in light of these extensive scientific research facilities, the court finds that Yellowstone falls within the meaning of "laboratory" under the FTTA.

■ Legislation enacted subsequent to the Yellowstone–Diversa CRADA also reinforces the conclusion that application of the FTTA to this CRADA is consistent with Congressional intent regarding cooperative scientific research agreements with units of the National Park System. Notably, in 1998, Congress enacted the National Parks Omnibus Management Act

("Parks Management Act"), 16 U.S.C. §§ 5901–6011, for the purpose of "enhanc[ing] management and protection of national park resources by providing clear legal authority and direction for the conduct of scientific study in the National Park System and to use information gathered for management purposes" and "to encourage others to use the National Park System for study to the benefit of park management as well as broader scientific value." 16 U.S.C. § 5931. To achieve this end, the statute specifically authorizes the Secretary of the Interior to "solicit, receive and consider requests from Federal or non-Federal public or private agencies, organizations, individuals, or other entities for the use of any unit of the National Park System for purposes of scientific study." *Id.* at § 5935(a). Moreover, the statute further empowers the Secretary to "enter into negotiations with the research community and private industry for equitable, efficient benefits-sharing arrangements." *Id.* at § 5935(d). Under these broad terms, the CRADA at issue here plainly constitutes an "equitable, efficient benefits-sharing arrangement" with a private entity for the purposes of scientific study. *Id.* Had Congress wished to foreclose units of the National Park System from entering into cooperative scientific research agreements with private industry in the wake of the Yellowstone–Diversa CRADA, its subsequent enactment displays a contrary intent. Instead, the far-reaching terms of the Parks Management Act reinforce the conclusion that the Yellowstone–Diversa CRADA is proper.

Having concluded that defendants have provided a rational basis for their determination that the FTTA definition of laboratory encompasses Yellowstone's myriad scientific research facilities, the court must next consider whether the CRADA is consistent with the relevant Park Service statutes and regulations. Plaintiffs contend that the CRADA conflicts with defendants' statutory mandates under the relevant organic statutes, the National Park Service Organic Act ("NPS Act"), 16 U.S.C. § 1, et

seq., and the Yellowstone National Park Organic Act ("YNP Act"), 16 U.S.C. § 21, et seq. Specifically, plaintiffs maintain that the CRADA constitutes a "consumptive use," and hence, is contrary to the conservation emphasis of the NPS Act and the YNP Act. *See Michigan United Conservation Clubs v. Lujan,* 949 F.2d 202, 206 (6th Cir.1991) (citing *National Rifle Ass'n,* 628 F.Supp. at 909). Plaintiffs further argue that the CRADA violates the Park Service's own regulations, which prohibit the "[s]ale or commercial use of natural products." 36 C.F.R. § 2.1(c)(3)(v). As explained below, this court disagrees with plaintiffs' contentions and finds that defendants have offered a reasoned basis explaining how the CRADA is consistent with the organic statutes and regulations.

■ Review of plaintiffs' challenges under the Park Service authorizing statutes, like plaintiffs' FTTA claim, is governed by the APA. Thus, as Congress has delegated the administration and preservation of national park resources to Interior and the Park Service, these agencies enjoy broad discretion in implementing their statutory responsibilities under the authorizing statutes. *National Rifle Ass'n of America v. Potter,* 628 F.Supp. 903, 911 (D.D.C.1986); *see also Sierra Club v. Andrus,* 487 F.Supp. 443, 449–50 (D.D.C.1980). Accordingly, their actions should be upheld as long as they are "based on a reasoned, permissible construction of the statute." *Daingerfield Island Protective Soc. v. Babbitt,* 40 F.3d 442, 446 (D.C.Cir.1994).

As its name indicates the National Park Service Organic Act ("NPS Act") is the general authorizing statute for the National Park Service. In relevant part, the NPS Act provides that

[t]here is created in the Department of the Interior a service to be called the National Park Service.... The service thus created shall promote and regulate the use of the Federal areas known as national parks, monuments, and reservations hereinafter specified ... by such

means and measures as conform to the fundamental purpose of said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1. The Yellowstone National Park Organic Act ("YNP Act") established Yellowstone as a unit of the National Park service, by providing that

The tract of land in the States of Montana and Wyoming [within specified boundaries] is reserved and withdrawn from settlement, occupancy, or sale under the laws of the United States, and dedicated and set apart as a public park or pleasuring ground for the benefit and enjoyment of the people; and all persons who locate, or settle upon, or occupy any part of the land thus set apart as a public park, except as provided in section 22 of this title, shall be considered trespassers and removed therefrom.

16 U.S.C. § 21.

▆▆ The court finds that defendants reasonably determined that the Yellowstone-Diversa CRADA is consistent with the above-quoted statutory authority and is not an impermissible "consumptive use" of park resources. *Michigan United Conserv. Clubs v. Lujan,* 949 F.2d 202, 206 (6th Cir.1991). Specifically, defendants concluded that the CRADA does not authorize consumptive use of natural resources because it does not grant Diversa the authority to sell any living material taken from the Park. Valley Aff., ¶ 37. In fact, as Yellowstone's Research Permitting Policy makes clear, Diversa never actually owns the specimens its collects, and thus has no right to transfer ownership of them.

A.R. I.1, at 3 ("All specimens collected within the park are the property of the National Park Service and, regardless of where the collections are housed, must be properly accessioned and catalogued into the National Park Service's cataloguing system."); *see also* Varley Aff., ¶ 75 ("A sale of [Yellowstone's] resources will *not* occur pursuant to a CRADA.").

More fundamentally, however, the CRADA does not conflict with the conservation mandate of the organic statutes because it does not grant Diversa the right to collect any research specimens at all. Indeed, contrary to plaintiffs' assertion, neither the CRADA nor its Scope of Work authorizes Diversa to take any natural materials from Yellowstone. Rather, the CRADA outlines the rights and responsibilities of Yellowstone and Diversa with respect to information and inventions developed *after* the conclusion of research specimen collection and analysis. Thus, the legal force and scope of the CRADA covers the use, ownership, development and allocation of revenues from useful discoveries or potential proprietary information developed from the research activities. By contrast, to conduct its research activities at Yellowstone, Diversa—like all other researchers in the Park—must apply for and obtain a research permit, which prescribes the terms and conditions of on-site research activities. 36 C.F.R. § 2.5; *see also* A.R. § II.20, ¶ 2.18 (noting that "[t]he term 'Research Specimen' means those items [Diversa] has the authority to collect under the collection permit or permits issued by [Yellowstone]"). Thus, while in certain respects the CRADA may impose restrictions on Diversa's research activities over and above those provided by a permit alone,[2] the research permit, not the CRADA, provides the legal basis for Diversa to collect specimens.

2. For example, the CRADA may give Park officials greater control over specimen extraction, as it expressly provides that "the specific sampling techniques and strategies will be jointly selected by [Yellowstone] and Diversa

to ensure that there is no significant impact to park resources or to other appropriate uses." A.R. § II.20, Statement of Work, at 2; *see also* Varley Aff., at ¶ 66.

In mounting a frontal attack on the CRADA, plaintiffs fail to recognize this critical legal distinction. While they challenge the CRADA, they do not in any way contend that the research permit issued to Diversa is improper or is otherwise invalid. Indeed, plaintiffs' misconception of the legal force of the CRADA reveals the fundamental flaws in their challenge. If the court were to find that the CRADA was improper under the relevant statutes, Diversa could still collect specimens under a research permit, as it has since 1994. The only—albeit critical—difference would be that Yellowstone could not share in any of the potential benefits from Diversa's research. Instead, the positive gains from the research would go exclusively to Diversa. Plaintiffs' challenge is further undermined by the fact that finding the CRADA to be an impermissible "consumptive use" of Park resources would necessarily imply that every other scientific research permit issued over the past century was equally invalid. Soukoup Decl., at ¶ 8 (stating that the earliest research permit allowing the collection of microbial samples was issued in 1898 and the Park currently issues approximately 250–300 research permits per year). But plaintiffs have offered no argument, evidence or suggestion that Diversa's research permit or the research permit program at Yellowstone are improper. Thus, in light of the longstanding policy and practice of allowing specimen collection at the Park, and because they are not properly before the court, the court need not reach the questions of the validity of the permit or the permit program.

Finally, the court finds that defendants properly determined that the CRADA was consistent with the governing statutes because it would produce direct, concrete benefits to the Park's conservation efforts by affording greater scientific understanding of Yellowstone's wildlife, as well as monetary support for Park programs. As early as 1994, defendants recognized that cooperation between Park officials and private researchers would be mutually beneficial. *See* A.R. § II.211; Varley Aff., at

¶ 44. Defendants determined that the potential scientific and economic benefits resulting from collaboration with private industry would support and strengthen the Park Service's primary mission of resource conservation. Varley Aff., at ¶ 46–47. Agreements like the Yellowstone–Diversa CRADA would allow the Park to share in revenues generated by beneficial developments, and thus, provide a valuable source of funding to support the Park Service's ongoing wildlife preservation, protection, and study initiatives. Equally critical to the Park's conservation efforts as adequate funding, improved scientific knowledge and understanding of Yellowstone's habitat generated by these types of joint research projects would be shared with the Park and used to support its efforts to preserve the environment.

In addition to their challenges under the organic statutes, plaintiffs also contend that the CRADA violates a Park Service regulation that bars the "sale or commercial use" of natural materials from the Park. 36 C.F.R. § 2.1(c)(3)(v) ("Section 2.1"). Specifically, plaintiffs advance that Park Service officials proceeded with the CRADA despite their awareness that such action was "illegal" under Park regulations But, as both the Court of Appeals for the District of Columbia Circuit and the Supreme Court have recognized, "the [Park] Service's interpretation of its own regulations will prevail unless it is 'plainly erroneous or inconsistent' with the plain terms of the disputed regulations." *Everett v. United States*, 158 F.3d 1364, 1367 (D.C.Cir.1998) (citing *Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997)).

The court finds that the Park Service reasonably determined that the Yellowstone–Diversa CRADA does not involve the "sale or commercial use" of park resources within the meaning of Section 2.1. The record discloses that defendants have provided a thoughtful and rational approach to research conducted on Park re-

sources. In concluding that the regulations did not foreclose the CRADA, the Park Service determined that there was a critical distinction between researchers profiting from the sale of the actual specimens themselves, which is prohibited by Section 2.1, and profiting from a future development based on scientific discoveries resulting from research on those resources, which is permitted. *See* A.R. II.40, Memorandum from Director of Yellowstone Center for Resources to Yellowstone Superintendent (May 21, 1997), at 3; *see also* A.R. II.20, CRADA (distinguishing between "research specimens" collected under the agreement (§ 2.18) and "products" derived from research involving those specimens (§ 2.14)). In reaching this conclusion, the Park Service considered several critical factors. First, it recognized that permit holders, such as Diversa, do not, by virtue of either the permit or the CRADA, acquire title to the specimens or the right to transfer them to third parties. A.R. II.1, Yellowstone Permitting Policy, at 3 (stating that "[a]ll specimens collected within the park are the property of the National Park Service and regardless of where the collections are housed, must be properly accessioned and catalogued in the National Park Service's cataloging system"); *id.* at 5 (noting that the "[s]ale of collected research specimens and other transfer to third parties is prohibited"). Second, the Park Service determined that permittees like Diversa, who later develop useful products, information or applications, are making "commercial use" of scientific discoveries, not Park resources. A.R. II. 45.m, at 3 (noting that "to date no firm has asked Yellowstone for a permit to collect research specimens for the purpose of replication and subsequent commercialization"). This interpretation accords with the fact that patent rights derive from human ingenuity brought to bear on scientific specimens, not the specimens themselves. *See Diamond v. Chakrabarty,* 447 U.S. 303, 313, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980) (stating that "the relevant distinction was not between living and inanimate things, but between products of nature, whether living or not, and human-made inventions, ... the result of human ingenuity and research"); *see also* Varley Aff. at ¶ 39.

Plaintiffs do not persuade the court that the defendants' interpretation of the regulation is unreasonable. Plaintiffs aver that because patent law allows scientists to obtain intellectual property rights over natural organisms, the CRADA at issue in this case necessarily involves the prohibited sale of natural materials. But this view of the scope of patent law ignores relevant precedent, which instructs that a substance occurring in nature may not be patented in that form. *Diamond,* 447 U.S. at 313, 100 S.Ct. 2204. Instead, to obtain a patent rights, a researcher must bring to a naturally-occurring substance a contribution that is non-obvious, novel and demonstrably useful. *See* 35 U.S.C. §§ 101–103. Thus, in accord with these fundamental principles, the Park Service has interpreted its regulations only to allow researchers to study, not sell, Park resources. The CRADA, in turn, accords with the regulations because any "commercial use" flowing from such research is limited to applications or products generated from the scientific study of the resources, not the resources themselves. Accordingly, the court finds that defendants reasonably construed Park regulations and concluded that the CRADA was consistent with their requirements.

## V. CONCLUSION

For the reasons set forth above, the court hereby GRANTS defendants' motion for partial summary judgment and DENIES plaintiffs' motion for partial summary judgment.

SO ORDERED.