Newman, Circuit Judge, dissenting.
Until discovery of the diagnostic method described in U.S. Patent No. 7,267,820 ("the '820 patent"), some 20% of patients suffering from the neurological disorderMyasthenia Gravis were not capable of being diagnosed. My colleagues rule that this new diagnostic method is not patent-eligible, although new and unobvious. However, "[t]his new and improved technique, for producing a tangible and useful result, falls squarely outside those categories of inventions that are 'directed to' patent-ineligible concepts." Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc. , 827 F.3d 1042, 1050 (Fed. Cir. 2016). The court again departs from the cautious restraints in the Supreme Court's Mayo / Alice application of laws of nature and abstract ideas.
This court's decisions on the patent-ineligibility of diagnostic methods are not consistent, and my colleagues today enlarge the inconsistencies and exacerbate the judge-made disincentives to development of new diagnostic methods, with no public benefit. I respectfully dissent.
The claims are for a multi-step method of diagnosis, not a law of nature
The '820 inventors did not patent their scientific discovery of MuSK autoantibodies. Rather, they applied this discovery to create a new method of diagnosis, for a previously undiagnosable neurological condition. The district court summarized this new diagnostic method as follows:
For the 20% of Myasthenia Gravis patients who do not have the AChR [acetylcholine receptor] autoantibodies, the '820 patent inventors discovered that they had IgG [immunoglobulin G] antibodies that attack the N-terminal domains of muscle specific tyrosine kinase ("MuSK"), a receptor that is located on the surface of neuromuscular junctions. ... [A] radioactive label is attached to MuSK (or a fragment thereof) and is then introduced to a sample of bodily fluid.... [T]he MuSK autoantibodies, if present, attach to the labeled fragment ... [and] is immunoprecipitated, the presence of the radioactive label on any antibody indicates that the person is suffering from Myasthenia Gravis.
Dist. Ct. Order , at 307-08[1] (citing '820 patent, col. 1, ll. 55-61). The claims recite the method, including preparation of the new radioactive entities and their chemical reactions to detect autoantibodies to the protein muscle-specific tyrosine kinase (MuSK). At issue are patent claims 7-9, shown with claim 1 (not in suit) from which they depend:
1. A method for diagnosing neurotransmission or developmental disorders related *758 to muscle specific tyrosine kinase (MuSK) in a mammal comprising the step of detecting in a bodily fluid of said mammal autoantibodies to an epitope of muscle specific tyrosine kinase (MuSK).
7. A method according to claim 1, comprising
contacting MuSK or an epitope or antigenic determinant thereof having a suitable label thereon, with said bodily fluid,
immunoprecipitating any antibody/MuSK complex or antibody/MuSK epitope or antigenic determinant complex from said bodily fluid and
monitoring for said label on any of said antibody/MuSK complex or antibody/MuSK epitope or antigen determinant complex,
wherein the presence of said label is indicative of said mammal is suffering from said neurotransmission or developmental disorder related to muscle specific tyrosine kinase (MuSK).
8. A method according to claim 7 wherein said label is a radioactive label.
9. A method according to claim 8 wherein said label is 125I [iodine isotope 125].
The reaction between the antibody and the MuSK protein was not previously known, nor was it known to form a labeled MuSK or its epitope, nor to form the antibody/MuSK complex, immunoprecipitate the complex, and monitor for radioactivity, thereby diagnosing these previously undiagnosable neurotransmission disorders.
Claims 7-9 require specific steps by which the diagnostic method is performed. The panel majority ignores these steps, and instead holds that "claims 7-9 are directed to a natural law because the claimed advance was only in the discovery of a natural law, and that the additional recited steps only apply conventional techniques to detect that natural law." Maj. Op. at 751. This analysis of patent-eligibility is incorrect, for the claim is for a multi-step method of diagnosing neurotransmission disorders related to muscle specific tyrosine kinase, by detecting autoantibodies using a series of chemical and biological steps as set forth in the claims. Eligibility is determined for the claim considered as a whole, including all its elements and limitations. Claim limitations cannot be discarded when determining eligibility under Section 101, as explained in Diamond v. Diehr , 450 U.S. 175, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981) :
In determining the eligibility of respondents' claimed process for patent protection under § 101, their claims must be considered as a whole. It is inappropriate to dissect the claims into old and new elements and then to ignore the presence of the old elements in the analysis.
Id. at 188, 101 S.Ct. 1048 ; see Parker v. Flook , 437 U.S. 584, 594, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978) ("[A] patent claim must be considered as a whole."); see also Aro Mfg. Co. v. Convertible Top Replacement Co ., 365 U.S. 336, 344, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961) ("[I]f anything is settled in the patent law, it is that the combination patent covers only the totality of the elements in the claim and that no element, separately viewed, is within the grant."); Mercoid Corp. v. Minneapolis-Honeywell Regulator Co ., 320 U.S. 680, 684, 64 S.Ct. 278, 88 L.Ed. 396 (1944) ("[A] patent on a combination is a patent on the assembled or functioning whole, not on the separate parts.").
The requirement that a claim is considered as a whole was not changed by the Mayo / Alice protocol of searching for an inventive concept within a claim that is directed to a law of nature or an abstract idea. It is incorrect to excise from the *759 claims any steps that are performed by conventional procedures. This is misconstruction of claims, and misapplication of Section 101. As reiterated in Bilski v. Kappos , 561 U.S. 593, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010) :
Section 101 is a dynamic provision designed to encompass new and unforeseen inventions. A categorical rule denying patent protection for inventions in areas not contemplated by Congress ... would frustrate the purposes of the patent law.
Id. at 605, 130 S.Ct. 3218 (internal citations and quotation marks omitted).
Applied to the '820 patent, the claimed method is a new method of diagnosing Myasthenia Gravis. After eliminating the "conventional" procedures, my colleagues rule that this new method is a "law of nature." However, these inventors are not claiming the scientific fact of a newly described autoantibody; they are claiming a new multi-step diagnostic method. This is not a law of nature, but a man-made reaction sequence employing new components in a new combination to perform a new diagnostic procedure.
Section 101 describes patent-eligible subject matter in broad and general terms
Section 101 does not exclude new methods of diagnosis of human ailments.
35 U.S.C. § 101 Inventions Patentable
Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.
Section 101 recites the subject matter of patent law, as distinguished from copyright law, which is also authorized by Article I, Section 8. This framework is "cast in broad terms," as the Court observed in Diamond v. Chakrabarty , 447 U.S. 303, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980) :
The subject-matter provisions of the patent law have been cast in broad terms to fulfill the constitutional and statutory goal of promoting "the Progress of Science and the useful Arts" with all that means for the social and economic benefits envisioned by Jefferson. Broad general language is not necessarily ambiguous when congressional objectives require broad terms.
Id. at 315, 100 S.Ct. 2204.
The Court has often discussed the exceptions to patent eligibility, stating that: "Phenomena of nature, though just discovered, mental processes, and abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work." Gottschalk v. Benson , 409 U.S. 63, 67, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972). "Thus, a new mineral discovered in the earth or a new plant found in the wild is not patentable subject matter. Likewise, Einstein could not patent his celebrated law that E=mc[2]; nor could Newton have patented the law of gravity. Such discoveries are 'manifestations of ... nature, free to all men and reserved exclusively to none'." Chakrabarty , 447 U.S. at 309, 100 S.Ct. 2204 (quoting Funk Bros. Seed Co. v. Kalo Inoculant Co. , 333 U.S. 127, 130, 68 S.Ct. 440, 92 L.Ed. 588 (1948) ). In Funk Brothers the Court explained:
The qualities of these bacteria, like the heat of the sun, electricity, or the qualities of metals, are part of the storehouse of knowledge of all men. They are manifestations of laws of nature, free to all men and reserved exclusively to none. He who discovers a hitherto unknown phenomenon of nature has no claim to a monopoly of it which the law recognizes. If there is to be invention from such a *760 discovery, it must come from the application of the law of nature to a new and useful end.
Id. at 130, 68 S.Ct. 440.
The Court early drew the distinction between scientific knowledge and its technological application. An oft-cited example is the case of O'Reilly v. Morse , 56 U.S. (15 How.) 62, 14 L.Ed. 601 (1854), where the Court declined patent-eligibility of Morse's claim 8 to "electromagnetism, however developed for marking or printing intelligible characters, signs, or letters, at any distances," id. at 112-13, but sustained Morse's claims to "us[ing] [ ] the motive power of magnetism ... as means of operating or giving motion to machinery, which may be used to imprint signals ... for the purpose of telegraphic communication at any distances." Id. at 85 ; see id. at 112. The Court criticized the breadth of Morse's claim 8, and stated:
In fine he claims an exclusive right to use a manner and process which he has not described and indeed had not invented, and therefore could not describe when he obtained his patent.
Id. at 113 ; see Adam Mossoff, O'Reilly v. Morse , George Mason Law & Econ. Research Paper No. 14-22 (Aug. 18, 2014), available at http://ssrn.com/abstract=2448363. In Mackay Radio & Telegraph Co. v. Radio Corp. of America , 306 U.S. 86, 59 S.Ct. 427, 83 L.Ed. 506 (1939), the Court explained that: "While a scientific truth, or the mathematical expression of it, is not patentable invention, a novel and useful structure created with the aid of knowledge of scientific truth may be." Id. at 94, 59 S.Ct. 427. These principles are the foundation of the truism that natural phenomena and abstract ideas are not patent-eligible.
As science and its applications advanced, particularly in the new fields of digital electronics and biotechnology, the jurisprudence kept pace. In Chakrabarty the Court considered a man-made bacterium, and held that eligibility under Section 101 applies to "anything under the sun that is made by man." 447 U.S. at 309, 100 S.Ct. 2204.
The most recent Court updates are Mayo Collaborative Services v. Prometheus Laboratories, Inc. , 566 U.S. 66, 132 S.Ct. 1289, 182 L.Ed.2d 321 (2012) (biotechnology), and Alice Corp. Pty. Ltd. v. CLS Bank Int'l , 573 U.S. 208, 134 S.Ct. 2347, 189 L.Ed.2d 296 (2014) (digital electronics). The Court reviewed Section 101 eligibility in these new fields, building on the vast body of jurisprudence since the first patent was analyzed by Thomas Jefferson as Secretary of State in 1790. See generally Ten Law Professors Br.;[2] Five Life Sciences Patent Practitioners Br.[3] These amici curiae explain the policy concern for preemption of scientific principles, and apply this concern to the case at bar, advising that the scientific information of the new autoantibody and its protein reactivity is available to all, and that the '820 patent claims 7-9 "did not preempt any 'law of nature' upon which the claimed diagnostic method relied." Five Life Sciences Patent Practitioners Br. at 1.
In Alice , the Court summarized the procedural framework for eligibility for patenting:
First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts.
*761 132 S.Ct. at 1296-1297. If so, we then ask, "[w]hat else is there in the claims before us?" 132 S.Ct. at 1297. To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. 132 S.Ct. at 1298, 1297.
Alice , 573 U.S. at 217, 134 S.Ct. 2347 (quoting Mayo ) .
This analysis comports with precedent, and the Court reiterated its caution that "too broad an interpretation of this exclusionary principle could eviscerate patent law. For all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." Mayo , 566 U.S. at 71, 132 S.Ct. 1289 ; see Alice , 573 U.S. at 217, 134 S.Ct. 2347 ("At the same time, we tread carefully in construing this exclusionary principle lest it swallow all of patent law."). We have echoed this concern, stating in Rapid Litigation Management , 827 F.3d at 1050, "[a]t step one, therefore, it is not enough to merely identify a patent-ineligible concept underlying the claim; we must determine whether that patent-ineligible concept is what the claim is 'directed to,' " (quoting Alice , 573 U.S. at 217, 134 S.Ct. 2347 ).
The panel majority departs from this guidance, for the claimed diagnostic method as a whole satisfies step one. The majority does not distinguish between the question of whether the claimed method as a whole is eligible, and the question of whether the separate steps use conventional procedures. Instead, my colleagues hold that since the separate procedures are conventional, it is irrelevant that the method as a whole is a new method. The majority misconstrues the claims, in holding that claims 7-9 are directed to the "concept" of "the correlation between the presence of naturally-occurring MuSK autoantibodies in bodily fluid and MuSK-related neurological diseases like MG." Maj. Op. at 750. The claimed method determines whether this correlation is present, for diagnostic purposes, but the concept itself is not claimed.
It is incorrect to separate the claim steps into whether a step is performed by conventional techniques, and then to remove those steps from the claims and their "conjunction with all of the other steps" for the purpose of Section 101 analysis. Diehr , 450 U.S. at 187, 101 S.Ct. 1048. All of the claim steps must be considered in the claimed combination. "It is inappropriate to dissect the claims into old and new elements and then to ignore the presence of the old elements in the analysis." Id. at 188, 101 S.Ct. 1048. The Court explained that a new process may be a combination of known steps:
This is particularly true in a process claim because a new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made.
Id. The Court stated that:
The "novelty" of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter.
Id. at 188-89, 101 S.Ct. 1048. The Court again recognized this principle in KSR Int'l Co. v. Teleflex Inc. , 550 U.S. 398, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007), stating that:
[I]nventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost *762 of necessity will be combinations of what, in some sense, is already known.
Id. at 418-19, 127 S.Ct. 1727. This court applied this principle in McRO, Inc. v. Bandai Namco Games America Inc. , 837 F.3d 1299, 1313 (Fed. Cir. 2016) (internal quotation marks omitted) and cautioned that "courts must be careful to avoid over-simplifying the claims by looking at them generally and failing to account for the specific requirements of the claims"-a caution disregarded today.
The panel majority contravenes the requirements of precedent, now holding that all of the steps of claims 7-9-that is, radioactive labelling, complexing, precipitating, and monitoring-are removed from consideration in the Section 101 analysis because they use conventional procedures; the majority holds that "[t]he '820 patent thus describes the claimed invention principally as a discovery of a natural law, not as an improvement in the underlying immunoassay technology." Maj. Op. at 751. However, that is not the claimed invention. In Mayo , 566 U.S. at 71, 132 S.Ct. 1289, the Court cautioned that "too broad an interpretation of this exclusionary principle could eviscerate patent law. For all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas."
Applying the Mayo / Alice protocol of two-step claim analysis, claims 7-9 of the '820 patent are patent-eligible under Step 1, for this method of diagnosing Myasthenia Gravis is not a law of nature, but a man-made chemical-biomedical procedure. Claims 7-9 recite a combination of technologic steps, all of which are limitations to the claims and cannot be disregarded whether for patentability or patent-eligibility or infringement. The court today violates this rule, in holding that because "the ... individual steps ... [of] '[i]odination and immunoprecipitation are standard techniques in the art,' " Maj. Op. at 748, these steps do not count under Section 101. Id. at 751-52.
Section 101 does not turn on whether any claim steps are "standard techniques." The appropriate analysis of the role of conventional process steps in claims to a new method is under Sections 102 and 103, not Section 101.
The amici curiae raise strong concerns for the consequences for biomedical diagnostics
This court's decisions have not been consistent. Today's decision is not consistent with, for example, Rapid Litigation Management , 827 F.3d at 1048, where the court held that although the general type of cell was known, and the manipulation of these specific cells was conducted in a conventional manner, the overall method was eligible under Section 101.
Amici curiae point out that the public interest is poorly served by adding disincentive to the development of new diagnostic methods. This is a severe criticism; and when presented by the entire industry, and stressed by thoughtful scholars, it warrants judicial attention.
The Biotechnology Innovation Organization[4] pleads for consistency in judge-made law, citing the
unabated uncertainty about the patent-eligibility of many biotechnological inventions, with diagnostic and prognostic methods being particularly affected. The unstable state of patent-eligibility jurisprudence affects modern biotechnologies ranging from biomarker-assisted methods *763 of drug treatment to companion diagnostic tests, fermentation products, industrial enzyme technology, and marker-assisted methods of plant breeding.
BIO Br. at 1. International concerns are presented by The Chartered Institute of Patent Attorneys,[5] an organization of the United Kingdom, stating that this decision conflicts with the eligibility of diagnostic methods under the Patent Cooperation Treaty and the European Patent Convention, and is inconsistent with the obligations of the United States under Article 27 and Note 5 of the Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS) administered by the World Trade Organization. CIPA Br. at 2.
Amici curiae Five Life Sciences Patent Practitioners point out that "The Supreme Court has recognized that patent ineligibility determinations (by courts or the Patent Office) have the potential to inhibit innovation," Five Life Sciences Patent Practitioners Br. at 6 (citing Bilski v. Kappos , 561 U.S. 593, 605, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010) ). They state concerns of the inventing/investing communities with respect to the future of diagnostics, because "[medical] diagnostic methods ... are so tightly bound to underlying natural laws and phenomen[a], they are especially susceptible to undue expansion of the eligibility standards implemented to protect the judicial exceptions as they have been explicated by the Supreme Court." Id. at 6-7.
Amici curiae Ten Law Professors direct us to the cost to develop and commercialize a new diagnostic, reported as $50-100 million, see Ten Law Professors Br. at 18-19 (citing Diaceutics Group, Mystery Solved! What is the Cost to Develop and Launch a Diagnostic? (2013), available at https://www.diaceutics.com/?expert-insight=mystery-solved-what-is-the-cost-to-develop-and-launch-a-diagnostic).
Undoubtedly there are a variety of interests in diagnostic procedures, and we take note that amicus curiae ARUP Laboratories[6] states that diagnostic tests should not be patentable at all. See generally ARUP Br. However, for procedures that require extensive development and federal approval, unpredictability of patent support is a disincentive to development of new diagnostic methods.[7] The loser is the afflicted public, for diagnostic methods that are not developed benefit no one.[8]
The judicial obligation is to provide stable, consistent application of statute and precedent, to implement the legislative purpose. With all respect to my colleagues on this panel, they misapply precedent and misinterpret the statute, adding discrepancies and disincentives to this important area of biomedicine. Claims 7-9 meet the *764 Section 101 eligibility rules, for the claims are to a new and useful method.
Applying the statute correctly, diagnostic claims should be evaluated for novelty and unobviousness, specificity and enablement. A method that meets these statutory criteria is within the system of patents, whether the diagnosed event occurs in the human body or in an extraneous device. From my colleagues' contrary conclusion, I respectfully dissent.

Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC , 275 F.Supp.3d 306 (D. Mass. 2017) ("Dist. Ct. Order ").

Amici Curiae Ten Law Professors, ECF No. 54 (Nov. 13, 2017) ("Ten Law Professors Br.").

Amici Curiae Five Life Sciences Patent Practitioners, ECF No. 52 (Nov. 13, 2017) ("Five Life Sciences Patent Practitioners Br.").

Amicus Curiae Biotechnology Innovation Organization, ECF No. 53 (Nov. 13, 2017) ("BIO Br.").

Amicus Curiae The Chartered Institute of Patent Attorneys, ECF No. 51 (Nov. 13, 2017) ("CIPA Br.").

Amicus Curiae ARUP Laboratories, ECF No. 76 (Feb. 6, 2018) ("ARUP Br.").

This court has invalidated patents on new diagnostic methods in Roche Molecular Sys., Inc. v. CEPHEID , 905 F.3d 1363, 1374 (Fed. Cir. 2018) ; Cleveland Clinic Found. v. True Health Diagnostics LLC , 859 F.3d 1352, 1363 (Fed. Cir. 2017) ; Genetic Techs. Ltd. v. Merial L.L.C. , 818 F.3d 1369, 1380 (Fed. Cir. 2016) ; Ariosa Diagnostics, Inc. v. Sequenom, Inc. , 788 F.3d 1371, 1378 (Fed. Cir. 2015) ; In re BRCA1- & BRCA2-Based Hereditary Cancer Test Patent Litig. , 774 F.3d 755, 765 (Fed. Cir. 2014).

It is estimated that 66% of all medical treatment decisions are based on the results of in vitro diagnostic testing. Ulrich-Peter Rohr, et al., The Value of In Vitro Diagnostic Testing in Medical Practice: A Status Report , 11 PLoS One 1, 2, 11, 13 (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4778800/pdf/pone.0149856.pdf. See Ten Law Professors Br. at 18.